IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| HERBERT PENN | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) Case No. 1:13-CV-00785-JKB |
| | ) |
| NRA GROUP, LLC; | ) |
| AND DOES 1-10, inclusive | ) |
| | ) |
| Defendants | ) |
| | ) |

## DEFENDANT NRA GROUP, LLC'S BRIEF IN SUPPORT OF ITS SUMMARY JUDGMENT MOTION

**I. INTRODUCTION**

Plaintiff, Herbert Penn ("Penn" or "Plaintiff") complains that Defendant NRA Group, LLC ("NRA") called his cellular telephone using an automatic telephone dialing system ("ATDS") without his prior express consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii). (DE 15, Plaintiff's Second Amended Class Action Complaint, ¶¶ 1, 34.)[1] However, the undisputed facts demonstrate that NRA did not use an ATDS to place calls to Plaintiff's cell phone and therefore did not violate the TCPA. Alternatively, summary judgment should be entered in favor of NRA because the undisputed facts show that Plaintiff, by providing his cell phone number to his creditor, expressly consented to receiving calls at that number in an attempt to collect the debt.

**II. STANDARD OF REVIEW**

Federal Rule of Civil Procedure, Rule 56 (a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[1] Plaintiff has informed this Court that he will not seek class certification. (See DE 36, at B.)

1

and that the movant is entitled to a judgment as a matter of law." Material facts are those over which disputes "might affect the outcome of the suit under the governing law. Factual disputes that are irrelevant or unnecessary will not be counted*." Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Here, Defendant seeks summary judgment on Plaintiffs' Complaint on two separate grounds. First, that the undisputed facts show that NRA's telephone system is not an Automatic Telephone Dialing System as defined under the TCPA, an element on which Plaintiff bears the burden of proof. "[O]n the issues which the nonmoving party has the burden of proof, 'it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. [*Christian v. Minnesota Mining and Manufacturing Co.,* 126 F.Supp.2d 951, 956 (D.Md. 2001) (citing *Anderson v. Liberty Lobby, supra,* at 256.)]" *Sayyed v. Wolpoff & Abramson, LLP*, 733 F.Supp.2d 635, 640 (D.Md. 2010). Second, NRA seeks summary judgment based on the fact that Mr. Penn provided his cellular telephone number to his creditor, thus establishing express consent for NRA, as a debt collector, to contact him at that telephone number. *See* 47 U.S.C. § 227(b)(1)(A)(iii); *In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 23 FCC Rcd 559, 564 ¶ 9 (Jan. 4, 2008). "Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). . . . When the defendant has produced sufficient evidence in support of its affirmative defense, the burden of production shifts to the plaintiff to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Ray*

*Communications, Inc. v. Clear Channel Communications, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012), *quoting Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 614 (4th Cir. 1999).

## III. STATEMENT OF UNDISPUTED FACTS

On March 30, 2012 Harbor Hospital electronically referred Plaintiff's unpaid medical bill to Defendant NRA for collection. (Affidavit of Ashley Chille ["Chille Aff."], ¶ 2.)[2] The collection file transmitted from Harbor included two telephone numbers for Penn, a home number of 410-664-0430 and a work number of 410-746-0761. (Chille Aff., ¶ 8; Affidavit of Betty Koerber ["Koerber Aff.], ¶ 8.) Pursuant to NRA's policies, both numbers were immediately put through a "cell phone scrub," to determine if they were cell phones. (Chille Aff., ¶ 9.) The "work number" came back as a cell phone, and was moved to the cellular phone number field in NRA computer system. (Chille Aff., ¶ 10.)

These telephone numbers were provided to Harbor on forms that were completed by Mr. Penn at his doctor's office. (Affidavit of Betty Koerber ["Koerber Aff.], ¶¶ 5 & 7.) Any contact numbers Harbor has for patients would be obtained from the forms completed by the patient, as Harbor does not conduct any searches from outside sources to obtain contact information for its patients. (Koerber Aff., ¶¶ 9-10.) NRA has been collecting debts for Harbor Hospital for ten (10) years. (Chille Aff., ¶ 4.) As a result of this long-standing relationship NRA is aware that Harbor only obtains patient contact information directly from patients and has found Harbor's records to be accurate and reliable. (Chille Aff., ¶ 5.)

---

[2] NRA had previously been referred outstanding Harbor Hospital balances owed by Mr. Penn on September 30, 2010 and August 26, 2011. (Chille Aff., ¶ 3.) NRA's computerized collection systems will create a "Fact Sheet" for each balance referred, but will place all "collection notes" tracking contacts, attempted contacts, and other information into the first Fact Sheet created. (Chille Aff., ¶ 6.) Here that Fact Sheet showing the referral on March 30, 2012 is attached to the Chille Affidavit, as Exhibit A while Exhibit B shows all activity related to NRA's efforts to collect from Mr. Penn on behalf of Harbor Hospital. (Chille Aff., ¶ 7.)

NRA has policies and procedures in place to prevent it from calling cellular telephone numbers in violation of the TCPA. (Chille Aff., ¶ 12.) These policies include running a cellular telephone "scrub" to identify any cellular telephone numbers received from any source. (Chille Aff., ¶ 13.) Any cellular telephone number identified is then placed in the cellular telephone field of the computer program used to track collection efforts. (Chille Aff., ¶ 14.) It is NRA's policy to only call cellular telephone numbers that are received directly from the creditor. (Chille Aff., ¶ 15.)

NRA's Mercury Dialer was used to place all calls to Mr. Penn's cellular telephone number. (Affidavit of Charlene Sarver, ["Sarver Aff."] ¶ 3.) NRA determines the criteria that are to be used for any collection campaign utilizing telephone calls. (Sarver Aff., ¶ 4.) The criteria to be used in any particular call campaign is input into the dialer by the Assistant Director of Dialer and Collections. (Sarver Aff., ¶ 5.) Once the campaign criteria is input, the Mercury Dialer will access NRA's CRS FICO computer system to identify the first account that fits the criteria for the calling campaign and will place a call to that account. (Sarver Aff., ¶ 6.) After the first call is completed, the dialer will once again access the CRS FICO system to locate the next account fitting the criteria. (Sarver Aff., ¶ 7.) Consequently, the Mercury Dialer used by NRA does not store or produce numbers to be called, and does not have the present capability to do so. (Sarver Aff., ¶ 8.) Further, the Mercury Dialer does not have the capacity to randomly or sequentially generate numbers, nor the capacity to automatically call numbers from a pre-determined list, as it does not have the capacity to store such a list. (Sarver Aff., ¶¶ 9-10.) For the Mercury Dialer to have the present capacity to store, generate and call from a predetermined list would require modifications to both the hardware and software NRA used to contact Plaintiff. (Sarver Aff., ¶ 11.)

All of the calls placed to the Plaintiff's cell phone used campaign PaxtonCC (*See* Chille Aff., Exh. B), and were done in what is known as a "power dial mode." In this mode, a telephone call will not be placed by the dialer until a collector presses F4 on their keyboard to indicate that they are ready and available to participate in a telephone call. (Sarver Aff., ¶¶ 12-13.) The collectors must press F4 for each subsequent call as well. (Sarver Aff., ¶ 13.) The "power dial mode" is different from a predictive dialer, in that the dialer will not make multiple calls and attempt to predict when a collector will be ready to take a call, but instead will only place a call once a collector is available to interact with anyone who answers the telephone. (Sarver Aff., ¶ 14.) When the dialer is in the "power dial mode," it is impossible for it to dial numbers in the predictive mode. (Sarver Aff., ¶ 15.)

## IV. LEGAL ARGUMENT

### A. Overview of the Telephone Consumer Protection Act

"Congress enacted the TCPA to 'curb abusive telemarketing practices that threaten the privacy of consumers and businesses.' *Ashland Hosp. Corp. v. SEIU, Dist. 1199 WV/KY/OH*, No. 11–6006, 2013 WL 627234 (6th Cir. Feb. 21, 2013). Commensurate with this goal, the TCPA principally outlaws four practices. *See* 47 U.S.C. § 227(b)(1)(A)-(D)." *Lynn v. Monarch Recovery Management, Inc.,* 2013 WL 1247815, 3 (D.Md. March 25, 2013.)

Only one practice is implicated here. Specifically, 47 U.S.C. § 227(b)(1)(A)(iii) prohibits "any person . . . [from] . . . mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service, . . . or other radio common carrier service, or any service for which the called party is charged for the call."

"To state a claim under the TCPA for calls made to a cellular phone, a plaintiff must establish that: (1) a call was placed to a cell or wireless phone, (2) by the use of any automatic dialing system and/or leaving an artificial or prerecorded message, and (3) without prior consent of the recipient." *Pugliese v. Professional Recovery Service, Inc.,* 2010 WL 2632562, *7 (E.D.Mich. June 29, 2010). The undisputed facts show that Plaintiff will not be able to establish that NRA's phone system is an ATDS, while NRA will be able to prove that it had Mr. Penn's consent to call him on this cellular telephone. Summary judgment should be entered in favor of Defendant NRA on Plaintiff's sole claim under the TCPA.

**B.      The Undisputed Facts Show that NRA's Mercury Dialer is Not an ATDS under the TCPA**

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. §227(a)(1)(A)-(B). Plaintiff bears the burden of proving that an ATDS was used to place the calls at issue, a burden he cannot meet in light of the undisputed facts.

Here the undisputed facts demonstrate that the Mercury Dialer used by NRA cannot store or produce numbers to be called, and does not use or have the capacity to use a random or sequential number generator. "'Random number generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111–1111, (111) 111–1112, and so on." *Griffith v. Consumer Portfolio Serv., Inc.,* 838 F.Supp.2d 723, 725 (N.D.Ill. 2011). NRA's Mercury Dialer does not have this capacity.

As the telephone industry has advanced since the passage of the TCPA, the Federal Communication Commission ("FCC") has refined its definition of what qualifies as an ATDS under the rule making authority granted to it by the TCPA. In 2002, the FCC determined that

6

"predictive dialers," were within the definition of an ATDS. *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014, 14092-93, ¶¶ 131-133 (July 3, 2003.) The 2003 FCC Order discussed several attributes of predictive dialers that supported its ruling that predictive dialers fall into the statutory definition of an ATDS. None of those attributes are present in the system NRA used to call Mr. Penn's cell phone.

First, the FCC held that predictive dialers are an ATDS because "[t]he basic function of such equipment [is] ... the capacity to dial numbers without human intervention." *Id.* at ¶ 132. Here, in contrast, human intervention was required to place the calls to Plaintiff's cell phone. Mr. Penn had to provide his number, the Assistant Director of Collections had to input the criterion for the calling campaign into the dialer, and a collector had to push F4 to indicate that the individual collector was available to participate in a call before any call could be initiated. In *Gragg v. Orange Cab Co., Inc.*, --- F.Supp.2d ---, 2014 WL 494862, *3 (W.D.Wash., Feb. 7, 2014), the Court found that the defendant's system at issue did "not function in the manner prohibited by the FCC [because in] order for a text dispatch notification to be sent to a customer, the customer must have first provided some amount of information to the dispatcher, the dispatcher must have pressed "enter" to transmit that information to both the TaxiMagic program and the nearest available driver, and the driver must have pressed "accept" on his or her Mobile Data Terminal." This level of human involvement was held sufficient to qualify as "human intervention" so that the system was not a predictive dialer under the FCC rulings. *Id.* at *3-*4. Here, the result should be the same. Not only did the collector have to push a button to have the dialer dial the number, but there was a live person waiting to engage in a conversation if the call was answered. In essence the dialer was acting as nothing more than a search engine to locate an appropriate account and a speed dialer to dial the number.

In its Order the FCC also noted that "the principle feature of predictive dialing software is a timing function, not number storage or generation," and that one of the attributes of a predictive dialer is to "assist telemarketers in predicting when a sales agent will be available to take calls." *Id.*, at ¶ 131. A predictive dialer will do just what its name says – it will place numerous calls, and using an algorithm, will attempt to predict not only how many will be answered, but when the next agent will be available to take a call. It is the fact that a predictive dialer can place thousands of calls or send millions of text messages that has been the focus of the FCC and case law when examining whether a system is an ATDS. *See, e.g., Fields v. Mobile Messengers America, Inc*., 2013 WL 6774076,* 3 (N.D.Cal. Dec. 23, 2013) (where "equipment has the capacity to send millions of texts per month and . . . the temporal manner in which the texts were sent indicates that 'human agency was not involved,' a genuine issue of material fact existed as to whether the equipment was ATDS under the TCPA); 18 FCC Rcd at 14093, ¶ 133 (noting that "autodialers can call thousands of numbers in a short period of time.")

The undisputed facts show that the calls to Plaintiff's cellular telephone number were made in "power dial mode," not in "predictive mode." The dialer in this mode is not capable of dialing "thousands of numbers in a short period of time," as it waits for a collector to be available to be in on the call *before* it is dialed. The fact that the telephone number is then dialed by a machine and not by the collector would make for a negligible, at best, time savings. The Mercury Dialer as used to call Plaintiff does not have the timing attributes that form the basis of the FCC's ruling, and is not a predictive dialer as contemplated by the FCC.

Further, the FCC noted that "the legislative history also suggest that through the TCPA, Congress was attempting to alleviate a particular problem – an increasing number of automated and prerecorded calls to certain categories of numbers, . . . [including] emergency numbers,

health care facilities, telephone numbers assigned to wireless services, and other numbers for which the consumer is charged for the call, [as such] practices were determined to threaten the public safety and inappropriately shift marketing costs from sellers to consumers." *Id.,* at ¶ 133. Here, none of these concerns are implicated, as NRA's Mercury Dialer only calls cellular telephone numbers that are provided by the debtors to their creditors, and these calls do not contain "marketing" information. The FCC has determined that debt collection calls do not transmit unsolicited advertisements, but rather contact persons with whom the creditor has an existing business relationship and do not implicate the privacy concerns at issue from unsolicited marketing calls. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Report and Order, 7 FCC Rcd 8752, 8769-73, ¶¶ 32 – 39 (1992); *see also,* 23 FCC Rcd at 565, ¶ 11 ("calls solely for the purpose of debt collection or to recover payments are not telephone solicitations and do not constitute telemarketing.")

In this same Order, the FCC noted that it had become more cost-effective to upload and use lists of numbers, rather than to randomly generate numbers to call, and that it would be incongruous to hold that a dialer placing calls to emergency or cellular numbers from such a list is not an ADTS, while a system that randomly generates such a call is an ATDS. 18 FCC Rcd at 14092-3, ¶¶ 132-133. Here, the undisputed facts show that NRA does not upload lists of numbers into its dialer. Again, its dialer does not have the attributes the FCC noted made predictive dialers come within the definition of an ATDS.

Additionally, Courts have recognized that telephone technology is rapidly advancing and that "capacity" as used in the TCPA's definition of an ATDS must mean "present capacity," as almost any phone could, with the purchase of an "app" or some software, become a system with the capacity to function as an ATDS and therefore be subject to the TCPA. Just this month, the

District Court for the Western District of Washington held that "if any technology with the **potential** capacity to store or produce and call telephone numbers using a random number generator constitutes an ATDS, [that definition] would capture many of contemporary society's most common technological devices within the statutory definition," but that such a result would be "absurd." *Gragg, supra,* at *2 (emphasis in original). Consequently the Court determined that a "system's status under the TCPA [should be] based on the system's **present,** not **potential,** capacity to store, produce, or call randomly or sequentially generated telephone numbers." *Id.* (emphasis in original.) *See also, Hunt v. 21st Mortg. Corp.,* 2013 WL 5230061, at *4 (N.D.Ala. Sept.17, 2013) ("in today's world, the possibilities of modification and alteration are virtually limitless," so "capacity" means the ability to meet the definition of an ATDS without any software modifications, noting that otherwise a broad reading of "capacity" would subject all iPhone owners to 47 U.S.C. § 227 as software potentially could be developed to allow their device to automatically transmit messages to groups of stored telephone numbers.)

Here, it is undisputed that the Mercury Dialer did not have the present capacity to store or produce or randomly call numbers. Further it is undisputed that when the dialer was calling Plaintiff's cellular telephone, it was not and could not operate as a predictive dialer, but rather had to rely on human intervention to place a call. Therefore the Mercury Dialer used by NRA to call Plaintiff was not an ATDS under the TCPA, and the calls were not subject to the prohibitions of the TCPA embodied in 47 U.S.C. § 227(b)(1)(A)(iii). Summary judgment must be entered in NRA's favor.

## C. The Undisputed Facts Show That Plaintiff Consented To NRA's Calls To His Cellular Telephone by Providing His Cellular Telephone Number to His Creditor, Harbor Hospital

Assuming, *arguendo,* that Plaintiff could raise a triable issue of material fact as to whether NRA's dialer is an ATDS, his claim under the TCPA is still without merit, as the calls placed to his cell phone are permissible under the TCPA.

The Federal Communications Commission's Rules and Regulations, implementing the TCPA provide that:

> the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt. In the *1992 TCPA Order*, the Commission determined that 'persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.'" [*In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 23 F.C.C.R. 559, 564–65 ¶ 10 (F.C.C. Jan. 4, 2008)] The FCC thus declared that "autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt . . . are permissible." *Id.* at 564, ¶ 9.

*Chavez v. Advantage Group*, ___ F.Supp.2d ___, 2013 WL 4011006, *4 (D.Colo. Aug. 5, 2013) (holding that giving a cellular number to a medical provider operates as prior express consent to receive cell phone calls from provider's debt collector) *and cases cited therein*. Defendant bears the burden of proof to show prior express consent. *Id.* "Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." 23 F.C.C.R. 559, 564–65 ¶ 10.

Here, the records of Harbor Hospital, attached to the Affidavit of Betty Koerber as Exhibits A through C, demonstrate that Mr. Penn's telephone number was provided to the Hospital on forms that were completed by Mr. Penn as part of the patient registration process, and that this is the only way Harbor could have obtained Plaintiff's cellular telephone number.

Further the undisputed facts demonstrate that this number was part of the electronic records transmitted to NRA when Mr. Penn's medical debt was referred to NRA for collection.

The FCC has broadly determined that debt collection calls from a debt collector that are made to a cellular telephone number provided by the debtor to the creditor are permissible under TCPA. Numerous cases have specifically applied this prior express consent exemption to calls made, as here, by debt collectors where the telephone number was provided to a medical care provider. *See, e.g. Chavez, supra,* at *4; *Mitchem v. Illinois Collection Service, Inc.*, 2012 WL 170968,* 2 (N.D.Ill. Jan. 20, 2012) (finding that Plaintiff's TCPA claim failed where he provided his cell phone number to a medical provider at the time of treatment, even if he did not understand that the medical provider would give the number to a debt collector if he failed to pay his bill); *Kenny v. Mercantile Adjustment Bureau, LLC*, 2013 WL 1855782, *7 (W.D.N.Y. May 1, 2013) (granting debt collector summary judgment for calls placed to a cell phone number not belonging to the debtor, but provided by the debtor on a hospital intake form in connection with obtaining medical treatment); *Pollock v. Bay Area Credit Serv., LLC,* 2009 WL 2475167, *9-*10 (S.D.Fla. Aug. 13, 2009) (noting in the context of collection of a medical debt that according to guidance provided by the Federal Communications Commission, prior express consent is deemed to be granted where the consumer provides a wireless number to the creditor during the transaction that resulted in the debt that is subject to the collection efforts); *see also Webb v. Healthcare Revenue Recovery Group LLC,* 2014 WL 325132, *3-*4 (N.D.Cal. Jan. 29, 2014)(recognizing on a motion to compel, that prior express consent to be called on a wireless telephone was relevant in a TCPA action brought against a debt collector collecting medical debts).[3]

---

[3] Plaintiff will likely cite to *Mais v. Golf Coast Collection Bureau, Inc.*, 944 F.Supp.2d 1226 (S.D.Fla. 2013) *cert. granted* (June 10, 2013) (rejecting the FCC rule and holding that the express consent must have been provided

As the undisputed facts show, Plaintiff consented to the calls received from NRA when he provided his cellular telephone number to his creditor, Harbor Hospital. Therefore, NRA is entitled to summary judgment on Plaintiff's only claim, because the calls at issue were made with his prior express consent, and are not prohibited under the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii).

V.  **CONCLUSION**

To prevail on a claim under 47 U.S.C. §227(b)(1)(A)(iii), three elements must be proven (1) that calls were made to a cellular telephone, (2) by an ADTS, (3) without the prior express consent of the person called. Here the undisputed facts show that the system used to call Plaintiff was not an ATDS as contemplated by the TCPA and the FCC. Even if NRA is found to have used an ATDS, that use was not in violation of the TCPA, where the undisputed facts show that Mr. Penn gave NRA prior express consent to contact him on his cellular telephone by providing that number to Harbor Hospital.

For the foregoing reasons, Defendant NRA Group, LLC, requests that summary judgment be entered in its favor and that this matter be dismissed with prejudice.

---

directly to the debt collector and not the healthcare provider/creditor.) However, the Eleventh Circuit has granted permission for an interlocutory appeal in the *Mais* case, and the "*Mais* court is the only federal district court to conclude that the district courts have jurisdiction to review FCC Rulings." *Chavez*, *supra,* at *3. *Cf.* S*acco v. Bank of America, N.A.,* 2012 WL 6566681, at *9 (W.D.N.C. Dec. 17, 2012); *Frausto v. IC Systems, Inc*., 2011 WL 3704249, *2 (N.D.Ill. Aug. 22, 2011) at *2; *Greene v. DirecTv, Inc.,* 2010 WL 4628734, at *3 (N.D.Ill. Nov. 8, 2010); *Hicks v. Client Services, Inc.,* 2009 WL 2365637, *4 (S.D.Fla. June 9, 2009); *Leckler v. Cashcall, Inc.,* 2008 WL 5000528, *2–3 (N.D.Cal. Nov. 21, 2008); *Baird v. Sabre Inc.,* --- F. Supp.2d ---, 2014 WL 320205, *4 (C.D.Cal. Jan. 28, 2014) (all holding that a district court may not review such rulings.)

THE LAW OFFICES OF RONALD S. CANTER, LLC


/s/ Birgit Dachtera Stuart
Birgit Dachtera Stuart, Esquire
Bar No. 17420
200A Monroe Street, Suite 104
Rockville, Maryland 20850
Telephone: (301) 424-7490
Facsimile: (301) 424-7470
E-Mail: bstuart@roncanterllc.com
*Attorney for Defendant NRA Group, LLC*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing was served upon the individual(s) listed below by Electronic Notification pursuant to ECF procedures on this 26th day of February, 2014 to:

Sergei Lemberg, Esquire
LEMBERG AND ASSOCIATES, LLC
1100 Summer Street, Third Floor
Stamford, Connecticut 06905
E-Mail: slemberg@lemberglaw.com
*Attorney for Plaintiff*


/s/ Birgit Dachtera Stuart
Birgit Dachtera Stuart, Esquire
*Attorney for Defendant NRA Group, LLC*